IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RENETTE HEREFORD,

                Plaintiff,

v.                                               OPINION and ORDER

CATHOLIC CHARITIES, INC.,                       18-cv-1049-jdp
DIOCESE OF MADISON,

                Defendant.

---

    Plaintiff Renette Hereford, appearing pro se, alleges that her former employer, Catholic Charities, Inc., Diocese of Madison, discriminated her because of her race by subjecting her to a hostile work environment and terminating her on baseless, pretextual grounds. Catholic Charities has filed a motion to dismiss the case as a sanction for Hereford's failure to comply with Magistrate Judge Stephen Crocker's order compelling her to comply with discovery, Dkt. 25, as well as a motion for summary judgment, Dkt. 27. Hereford opposes both motions. Dkt. 34 and Dkt. 51. She also moves for the issuance of 17 subpoenas, Dkt. 35 and Dkt. 38, through which she seeks to discover information and documents helpful to her case.

    I will deny Hereford's requests for subpoenas and dismiss the case. Hereford ignored a court order requiring her to sit for a deposition and provide complete written responses to Catholic Charities' discovery requests, Dkt. 23, which is reason enough to dismiss the case as a sanction. But ultimately I need not decide the sanctions motion because the record in this case shows that summary judgment for Catholic Charities is appropriate: Hereford has failed to provide evidence from which a reasonable jury could conclude that she was discriminated against on the basis of race. Hereford's attempt to salvage her case by seeking subpoenas comes

too late. I will order the clerk of court to enter judgment in Catholic Charities' favor and close the case.

## A. Failure to comply with court order

In October of last year, Catholic Charities filed a motion to compel discovery based on Hereford's failure to respond to its discovery requests and refusal to respond to its attempts to schedule a deposition. Dkt. 17. Hereford did not respond to that motion by the November 4, 2019 deadline, but in a November 5 phone call, she assured clerk's office staff that she would be mailing her response the next day. After weeks passed with still no response from Hereford, Magistrate Judge Crocker granted Catholic Charities' motion. He ordered Hereford to provide complete responses to Catholic Charities' discovery requests by December 3, 2019, and to make herself available for a deposition no later than December 19, 2019. He warned her that if she failed to comply with his order, it was "likely that this court will dismiss her lawsuit with prejudice for failure to comply with her fundamental discovery obligations." Dkt. 23.

Hereford did not comply with Magistrate Judge Crocker's order. According to Catholic Charities, Hereford provided only partial responses to the discovery requests and she failed to appear for her December 30, 2019 deposition. *See* Dkt. 26. Hereford says that Catholic Charities' attorney was "not being truthful" when he said that "he has not received any paperwork" from her, as she "mailed him the documents via next day express and he or someone in his law office had to sign for them." Dkt. 51, at 1. But Catholic Charities didn't say that it received no paperwork; it said that it received only partial responses to its discovery requests, which Hereford doesn't deny. Hereford also says that she "was not notified of a date or time for a deposition." *Id.* at 2. Catholic Charities submits evidence that it properly served Hereford with a notice of deposition; called and emailed her on the morning of her deposition;

and received a call from Hereford in which she confirmed receipt of the notice of deposition. Dkt. 26, ¶¶ 8, 9, 13, 15. The declarant, attorney Michael J. King, did not attach copies of the correspondence to Hereford, the notice of deposition, or her discovery responses. Nevertheless, on the basis of the declaration, I am satisfied that Catholic Charities properly served the notice of deposition.

Catholic Charities now asks me to dismiss the case as a sanction based on Hereford's defiance of the court's order. I would ordinarily be inclined to dismiss Hereford's case as a sanction for her litigation misconduct. "[B]eing a pro se litigant does not give a party unbridled license to disregard clearly communicated court orders." *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.), *opinion amended on denial of reh'g*, 87 F.3d 202 (7th Cir. 1996). Magistrate Judge Crocker made clear to Hereford what her litigation obligations were; after her counsel withdrew from the case, Magistrate Judge Crocker provided her with a copy of this court's pretrial conference order for pro se litigants, Dkt. 15, and he spelled out Hereford's discovery obligations quite plainly in his order on the motion to compel, Dkt. 23. Hereford offers no explanation for flouting Magistrate Judge Crocker's order. I would dismiss Hereford's case as a sanction were it not also apparent that Catholic Charities is entitled to summary judgment on the merits.

**B. Summary judgment**

Catholic Charities moves for summary judgment on all of Hereford's claims, contending that no reasonable jury could conclude that Catholic Charities terminated or otherwise took any adverse action against Hereford on the basis of her race. Although Hereford has filed materials opposing the summary judgment motion, she has not complied with this court's procedures governing summary judgment. She did not respond to Catholic Charities' proposed

findings of fact, Dkt. 29; propose her own supplemental proposed findings of fact in separate, numbered paragraphs; or support each of her factual assertions with admissible evidence. Instead, she submitted three documents in which she questions or disputes selected portions of Catholic Charities' characterization of the facts. *See* Dkt. 34; Dkt. 36; Dkt. 51.[1] Hereford's failure to follow this court's procedures has made it difficult to discern which facts are disputed and which facts aren't. I have reconstructed the events at issue below, noting the factual disputes where I see them.

1. **Facts**

Catholic Charities operates its "Community Connections" program in Janesville, Wisconsin, through which it offers daytime supervised activities for adults with developmental disabilities and traumatic brain injuries. At any given time, Community Connections has approximately 12 employees and 30 clients. In September 2011, Catholic Charities hired Hereford as a skills trainer. Skills trainers are at-will employees who are responsible for providing direct care, training, and supervision to Community Connections clients.

Hereford says that during her employment with Catholic Charities, she experienced racially motivated "verbal assaults, physical threats, write ups, intentional lying, and pure racial insults." Dkt. 36, at 3. But she doesn't provide specific information about these incidents in her summary judgment materials. In her complaint (which is not verified and therefore may not be used in evidence, *see Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996)), she alleged

---

[1] None of the three documents constitutes an admissible affidavit or declaration for purposes of Federal Rule of Civil Procedure 56(c)(1)(A). The submissions are neither sworn nor signed under penalty of perjury. *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) (briefs and other unsworn filings are not evidence). But I have considered them regardless; even if taken as true, they do not provide a basis for denying summary judgment.

that in 2011 and 2012, her colleagues told her they "were not happy" that Catholic Charities had hired a black person, put nails in her car tire, "mock[ed] black culture" by wearing hooded sweatshirts and beatboxing, and "made comments about how they do not like black people." Dkt. 1, ¶¶ 12, 13, 15. She also alleged that on January 18, 2013, she "was accosted and threatened" by one of her colleagues, David Abb, who "aggressively charged" her, "pointing his finger at her and then making a fist." *Id.* ¶ 17. (She does not allege that this incident was racially motivated.) But at summary judgment, Hereford provides no admissible evidence to substantiate these allegations, such as affidavits or declarations that comply with 28 U.S.C. § 1746.

The events that prompted this litigation occurred years later, on March 3, 2017. The parties' accounts of that day vary dramatically. According to Catholic Charities, at 11:13 that morning, Dee Barker, another skills trainer, saw Hereford grab a nonverbal client by the ear and shake the client's head at least four times. Barker immediately notified Joel Schenk, the program director. Schenk began an investigation in accordance with Catholic Charities' investigative procedures policy. He first examined the client outside of Barker's presence; he noted that her left ear was noticeably red and warm to the touch and that she had a red patch on her neck. He then asked Hereford if she knew how the client's ear and neck had become red. Hereford said that she didn't know. Schenk moved the client to another room to work with different skills trainers. He then followed up with Barker to ask which ear she had seen Hereford grab. Barker said that it had been the client's left ear.

Schenk and Amy Tiffany, a program coordinator, then interviewed Hereford privately. When confronted with the allegations, Hereford denied them, but Schenk perceived her denials as "not adamant," which "struck [him] as odd." Dkt. 30, ¶ 21, 22. Schenk asked Hereford how

5

the client's ear had become red, and Hereford said "I don't know. It might have been from sitting in the chair." *Id.* ¶ 25. Schenk sent Hereford home for the day, telling her that they would discuss the situation further the following week. He had Barker make a written statement, *see* Dkt. 32-9, and he documented Hereford's statement (which he found not to be credible). *See* Dkt. 32-10. He also completed an incident report, Dkt. 32-11, and notified the client's guardian, case manager, residential facility, and the state's adult protective services agency.

Hereford tells a different version of events. She says that "[w]hat started this chain of events on March 3" was that Schenk assigned Hereford to work alone with Abb, the colleague who had physically threatened her in 2013. Dkt. 51, at 1. Hereford refused to do so. Schenk was "so upset that [she] challenged his decision about working with David Abb that he did not speak to [her] all morning." *Id.* Around 10:50 that morning, Hereford was preparing lunches for clients when she turned around and noticed that Barker was looking at her "as if she was upset." Dkt. 36, at 1. Hereford "figured she was upset about [Hereford] not having to work with David Abb because he previously had physically threatened [Hereford]." *Id.* Hereford then turned around and saw that a client "had gotten out of the recliner." *Id.* She does not explain what, if anything, she did in response.

At 11:00, Hereford was sitting with the clients and assisting with lunch when Schenk approached. According to Hereford:

> Schenk . . . asked me how may day had been, and I said "I have had a wonderful day." Then I was telling him about [the client's] ear and neck and how red they had become, and I told him about what she was doing while she was sitting in the recliner, because [the client] had been making those strange faces again[.] I also let him know that her ear and neck were not like that until she sat in that recliner, but there was nothing in the recliner with her to

> make those marks so this might be a symptom [of] her undiagnosed medical issue.

*Id.* at 1–2. Hereford estimates that their conversation lasted half a minute. Around 11:30, the client walked into a different room. Hereford went to bring her back, but Schenk told her not to worry about her. Hereford tried to check up on the client two more times, but she was told both times that the client was being taken care of by others. By this point, Hereford "knew something was wrong," but she had "no way of knowing what the issue was." *Id.* at 2. Hereford continued working with other clients alone until noon, when two other employees arrived. Around 1:30 p.m., Schenk and Tiffany met with Hereford in Schenk's office. Hereford reiterated what she had told Schenk earlier in the day and she denied pulling the client's ear.

The parties don't dispute that Schenk sent Hereford home after their afternoon meeting. Schenk didn't speak with Hereford again until March 7, 2017, when he informed her that she was being terminated. Schenk says that he decided to terminate Hereford based on his determination that she had abused the client. Hereford contends that the abuse allegation is a pretext.

    **2. Analysis**

Hereford asserts claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Title VII prohibits race discrimination in the terms and conditions of employment. 42 U.S.C. § 2000e-2(a). This encompasses "requiring people to work in a discriminatorily hostile or abusive environment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), as well as subjecting employees to "materially adverse" employment actions, such as termination, based on race. *de la Rama v. Ill. Dep't of Hum. Servs.*, 541 F.3d 681, 685–86 (7th Cir. 2008). Section 1981 prohibits discrimination in the making and enforcement of contracts. "The legal analysis for discrimination claims under Title VII and § 1981 is identical," so the court will discuss the

two claims together. *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019) (citation omitted).

In her complaint, Hereford pleaded two theories of discrimination: (1) hostile work environment claims based on the racial harassment incidents she experienced; and (2) discrimination in the terms and conditions of her employment based on disparate levels of scrutiny and discipline (including termination) that she experienced relative to her non-black colleagues. Dkt. 1, ¶ 25. But Hereford's hostile work environment claims are time-barred. According to the complaint, the most recent racial harassment incident occurred on February 27, 2012. *See* Dkt. 1, ¶ 15.[2] (Hereford does not allege or adduce any evidence that the harassment incident in 2011 and 2012 influenced Schenk's decision to terminate her in 2017.) To raise a timely Title VII claim in Wisconsin, a plaintiff must file a charge with the EEOC within 300 days of the subject incident. Hereford didn't file her EEOC charge until December 2017. *See* Dkt. 32-14. And to raise a timely § 1981 claim, a plaintiff must file a lawsuit within four years of the alleged discriminatory act. *See Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 668 (7th Cir. 2014) (citing 28 U.S.C. § 1658). Filing an EEOC charge under Title VII doesn't toll the statute of limitations under § 1981. *See Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 465–67 (1975). Hereford didn't file this lawsuit until December 2018. So I will grant summary judgment to Catholic Charities on Hereford's hostile work environment claims.

That leaves the claims arising out of Hereford's termination on March 7, 2017. In evaluating these claims, "the appropriate question on summary judgment is simply: could a reasonable jury find based on all available evidence that a discriminatory . . . motive caused

---

[2] The altercation with Abb, which Hereford does not allege was race-based, occurred less than a year later, on January 18, 2013. Even if it were race-based, it too would be untimely.

[the plaintiff's] termination?" *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 569 (7th Cir. 2017). To survive summary judgment, Hereford must provide evidence from which a jury could infer that she was fired because of her race.

Hereford doesn't dispute that Catholic Charities would be justified in terminating a skills trainer who abused a client. Instead, Hereford contends that Catholic Charities fabricated the abuse allegation as a pretext. Specifically, Hereford argues that the "real reason" for the "trumped up" abuse allegation "is that on the day of the so-called incident, Joel Schenk wanted her to work with David Abb and she refused to, . . . as she had not worked alone with him since he physically threatened her." Dkt. 34, at 2. If that is Hereford's theory, it does not state a claim for race discrimination under Title VII or § 1981. An employer need not have good or just reasons for firing an employee. *See Balance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005) ("We do not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation."). Federal law requires only that the employer refrain from discriminating on the basis of race or another protected characteristic. *See Monroe v. Children's Home Ass'n of Ill.*, 128 F.3d 591, 593 (7th Cir. 1997). Hereford does not contend that Schenk's alleged anger about her refusal to work with Abb was in any way related to her race.

Even assuming that Hereford intended to argue that Schenk fabricated an abuse allegation as a pretext for race discrimination, I would nonetheless grant summary judgment to Catholic Charities. Hereford points to three pieces of evidence that she says demonstrate pretext, but none raise an inference of race discrimination. First, Hereford notes that Catholic Charities "ke[pt] her around the other clients" "until the end of her shift that day." Dkt. 34, at 1. If Catholic Charities truly regarded Hereford as a threat to its clients, she says, it would

9

have sent her home immediately. But elsewhere in her filings, Hereford says that she did not stay until the end of her shift. *See* Dkt. 36, at 2 ("I remained until 1:30pm. The shift ends at 3:00pm . . . ."). This fits with Catholic Charities' assertion that it sent Hereford home following Schenk's investigation. It does not raise an inference that the abuse allegation was fabricated, let alone that it was fabricated to cover up racial discrimination.

Second, Hereford contends that pretext can be inferred from Catholic Charities' failure to report the alleged abuse to the state's unemployment division. When Hereford applied for unemployment benefits, the adjudicator granted her application and made the following finding:

> The employee's discharge was not for misconduct or substantial fault connected to her employment. The employee was discharged due to allegations of a work rule violation. The employer may have made a valid business decision; however, they have not provided evidence to substantiate the allegations and it has not been established that her actions demonstrated a willful and substantial disregard of the employer's interests or substantial part of the employee.

Dkt. 34-1, at 1. Hereford says that Catholic Charities' failure to report any "misconduct or substantial fault" to the unemployment division shows that Catholic Charities didn't truly believe the abuse allegation. But Catholic Charities did report the incident—it reported that there had been a "work rule violation." That it didn't furnish the unemployment division with evidence substantiating the allegations doesn't raise an inference that the allegations were fabricated; it merely shows that Catholic Charities opted not to spend time and resources fighting Hereford's claim for unemployment benefits. And Hereford doesn't dispute that Catholic Charities reported the incident to the client's guardian, case manager, residential facility, and the state's adult protective services agency. The reporting suggests that Catholic

Charities sincerely believed the abuse allegation, because such a disclosure could have negative ramifications for an organization like Catholic Charities.

Third, Hereford suggests that Barker, the colleague who purportedly witnessed the abuse incident and reported it to Schenk, fabricated the allegations. Hereford says that Barker has a "conflict of interest" (by which I understand Hereford to mean that Barker had a motive to get Hereford fired) because Barker is a "harasser . . . who has no respect" for Hereford and who previously "stated that she did not like black people." Dkt. 34, at 1. But even taking as true Hereford's assertion that Barker fabricated the abuse allegations, Hereford can do no more than speculate that racial animus is what motivated Barker. Hereford's assertion that Barker once said that she "did not like black people" is vague (Who did she say it to? When? In what context?) and supported by no admissible evidence. Although Hereford "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (citation and quotation marks omitted).

C.  Requests for subpoenas

Hereford asks me to issue subpoenas for 17 individuals and entities who she says will be able to "testify as to what comments were made about [her] skin color" and provide "relevant information concerning the day of [her] termination." Dkt. 51, at 1. *See* Dkt. 35 and Dkt. 38. But it is too late for that. At summary judgment, the plaintiff must "put up or shut up" and "show what evidence [she] has that would convince a trier of fact to accept [her] version of events." *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). If Hereford believed that these witnesses and documents could help her prove her claims, she should have sought them before Catholic Charities moved for summary judgment,

11

not after. Although I understand that discovery can pose challenges for pro se litigants, Hereford offers no explanation for her apparent failure to gather any evidence in the months leading up to summary judgment. So I will deny Hereford's requests for subpoenas.

**D. Conclusion**

It is clear from Hereford's filings that she believes that Catholic Charities treated her unfairly in many ways. But a plaintiff's own beliefs are not enough to defeat a motion for summary judgment. The plaintiff must come forward with enough admissible evidence to permit a reasonable jury to find not only that the employer acted unfairly, but also that it discriminated against her. Because Hereford has not provided any evidence to support her allegations or race discrimination, I will grant Catholic Charities' motion for summary judgment and dismiss the case.

ORDER

IT IS ORDERED that:

1. Defendant Catholic Charities, Inc., Diocese of Madison's motion for summary judgment, Dkt. 27, is GRANTED.

2. Defendant's motion to dismiss as a sanction for plaintiff's failure to comply with a court order, Dkt. 25, is DENIED as moot.

3. Plaintiff Renette Hereford's motions for issuance of subpoenas, Dkt. 35 and Dkt. 38, are DENIED.

4. Plaintiff's claims are DISMISSED with prejudice.

5. The clerk of court is directed to enter judgment in favor of defendant and close the case.

Entered May 5, 2020.

                                      BY THE COURT:

                                      /s/

                                      _____
                                      JAMES D. PETERSON
                                      District Judge